## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |
|---|---|
| GREGORY FOX, et al., | ) <br> ) <br> ) |
| Plaintiffs, | ) |
| v. | ) Docket no. 2:22-cv-00251-GZS |
| PENDER MAKIN, et al., | ) <br> ) <br> ) |
| Defendants. | ) <br> ) <br> ) |

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

Before the Court are two Motions to Dismiss filed by: (1) Defendant Pender Makin, the Commissioner of the Maine Department of Education (the "Commissioner") (ECF No. 50); and (2) Defendants Maine School Administrative District 51 ("MSAD 51"), Jeffrey Porter, Sally Loughlin, and Cory Munsey (collectively, the "School Defendants") (ECF No. 51). On May 8, 2023, the Court held oral argument on these Motions. Having considered the Motions, related filings (ECF Nos. 49, 54-55, 60-61, 68, 74-75, 77-79), and arguments presented, the Court GRANTS IN PART and DENIES IN PART the Motions for the reasons stated herein.

## I.    LEGAL STANDARD

The Commissioner and the School Defendants (collectively, "Defendants") filed their Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. The same plausibility standard applies to a motion brought under either Rule 12(b)(1) or 12(b)(6). See Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003); Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995).

In resolving a facial jurisdictional challenge under Rule 12(b)(1), the Court "accept[s] the well-pleaded facts alleged in the complaint as true and ask[s] whether the plaintiff has stated a plausible claim that the [C]ourt has subject matter jurisdiction." Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth., 4 F.4th 63, 69 (1st Cir. 2021).[1]  Plaintiffs generally bear the burden of demonstrating subject matter jurisdiction.  See Woo v. Spackman, 988 F.3d 47, 53 (1st Cir. 2021).

In conducting a Rule 12(b)(6) analysis, the Court must consider whether the complaint contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In evaluating whether a complaint states a plausible claim, [the Court] 'perform[s] a two-step analysis.'" Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Cardigan Mountain Sch. v. New Hampshire Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015)).  First, "the [C]ourt must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Morales-Cruz v. University of Puerto Rico, 676 F.3d 220, 224 (1st Cir. 2012).  Second, the Court "must determine whether the 'factual content . . . allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678).  "This standard is 'not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" Saldivar, 818 F.3d at 18 (quoting Iqbal, 556 U.S. at 678).  In "evaluating the plausibility of a legal claim," the Court "draw[s] on its judicial experience and common sense" but "may not disregard properly pled factual allegations, even if . . . actual proof of those facts is improbable." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (internal

---

[1] If a Rule 12(b)(1) motion advances a *factual* rather than *facial* challenge (i.e., the motion contests certain facts), "the court must engage in judicial factfinding to resolve the merits of the jurisdictional claim." Cebollero-Bertran, 4 F.4th at 69.  The Court need not engage in such factfinding here, as Defendants present only a facial challenge.

citation and quotation marks omitted). Rather, "[t]he relevant inquiry focuses on the reasonableness of the inference of liability" drawn from the facts. Id. at 13. To assess whether a complaint adequately states a claim, the Court may "consider (a) implications from documents attached to or fairly incorporated into the complaint, (b) facts susceptible to judicial notice, and (c) concessions in the plaintiff's response to the motion to dismiss." Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020) (cleaned up). The Court may also consider certain "matters of public record." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011).

## II.    BACKGROUND

### A.    Statutory Background

Under Maine law, "[a] superintendent may not permit any child to be enrolled in or to attend school without a certificate of immunization for each disease or other acceptable evidence of required immunization or immunity against the disease . . . ." 20-A M.R.S.A. § 6355;[2] see 05-071 Me. Code R. ch. 126 § 2(B) (2021); 10-144 Me. Code. R. ch. 261 § 2(B) (2021). The Maine Department of Education and Maine Center for Disease Control have jointly enumerated nine diseases that require vaccination under this law (hereinafter, "section 6355"). See 05-071 Me. Code R. ch. 126 § 2 (2021); 10-144 Me. Code. R. ch. 261 § 2 (2021). There are, however, exceptions to section 6355's vaccination requirement for a student: (1) whose "parent provides a written assurance the [student] will be immunized within 90 days . . . or provides . . . a written consent to the [student]'s immunization"; (2) who (or whose parent) provides "a written statement from a licensed physician, nurse practitioner or physician assistant that," in that person's

---

[2] In this context, "'Superintendent' means the superintendent of schools of a school administrative unit, or a person designated by the superintendent . . . ." 20-A M.R.S.A. § 6355(8). A "school" is "any public or private elementary or secondary school in" Maine. Id. § 6353(7). A "[c]ertificate of immunization" is "a written statement from a physician, nurse or health official who has administered an immunizing agent to a child, specifying the dosage administered and the date it was administered." Id. § 6353(1).

"professional judgment, immunization against one or more of the diseases may be medically inadvisable"; or (3) who was "covered by an individualized education plan on September 1, 2021" and attended school unvaccinated by claiming "a philosophical or religious exemption . . . pursuant to the law in effect prior to that date," provided the parent or guardian (or student, if 18 years old) submits "a statement from a licensed physician, nurse practitioner or physician assistant that" such person "has consulted with that parent or guardian . . . [or student] and has made that parent or guardian [or student] aware of the risks and benefits associated with the choice to immunize."[3] 20-A M.R.S.A. § 6355.  These three exemptions were a result of "An Act to Prevent Maine Children and Students from Preventable Diseases by Repealing Certain Exemptions From the Laws Governing Immunization Requirements," which the Maine legislature passed in 2019.  P.L. 2019, c. 154, §§ 1-3 (effective Sept. 1, 2021).  The Act also repealed an exemption that had previously been provided to those with sincerely held religious beliefs or philosophical reasons that were contrary to vaccination.  See id.; see also 20-A M.R.S.A. § 6355(3) (2008).  These amendments to section 6355 went into effect on September 1, 2021.[4]

### B.    Factual Background[5]

Plaintiffs, Gregory and Rita Fox, hold "sincerely held religious convictions that prevent them from having [their son] C.F. get vaccinated."  (Am. Compl. (ECF No. 45), PageID # 418, ¶ 22.)  C.F. attended kindergarten at Mabel I. Wilson Elementary School in MSAD 51 during the

---

[3] This last exemption is referred to as the "IEP sunset provision."

[4] Between 2015 and 2021, three other states – Connecticut, California, and New York – also repealed religious or philosophical exemptions from school immunization requirements.  See 2021 Conn. Pub. Acts 21-6 (amending Conn. Gen. Stat. § 10-204a); 2015 Cal. Legis. Serv. ch. 35 (amending Cal. Health & Safety Code § 120325 et seq.); 2019 N.Y. Sess. Laws ch. 35 (amending N.Y. Public Health Law § 2164(9)).

[5] The Court has drawn the factual narrative that follows from the factual allegations in the Amended Complaint, which this Court must accept as true.  See Morales-Cruz, 676 F.3d at 224.

2020-2021 school year under the religious exemption permitted at the time.  (Id., ¶ 23.)  For the following year, Plaintiffs "requested a religious exemption for C.F. under the First and Fourteenth Amendments to the U.S. Constitution."  (Id., PageID # 419, ¶ 29.)  However, the Commissioner "informed, directed, and ordered . . . Porter, Loughlin, and Munsey . . . that children can no longer get religious exemptions from the vaccination requirement."  (Id., PageID # 417, ¶ 21.)

Acting on the Commissioner's directive and order, "Principal Sally Loughlin and Vice Principal Corey Munsey denied . . . a religious exemption for C.F., stating that religious exemptions were no longer allowed under state law, and refused to let C.F. attend school for the 2021-2022 school year" because of his unvaccinated status.  (Id., PageID # 419, ¶ 25; see id., ¶ 27; see id., PageID # 423, ¶s 41.5 – 41.6.)  Additionally, in May 2022, "Superintendent Jeffrey Porter 'unenrolled' C.F. from the Mabel I. Wilson Elementary School, with the explanation that Maine law had changed and that students could no longer get religious exemptions from the vaccination requirement."  (Id., PageID # 419, ¶ 26.)[6]  Porter, Loughlin, and Munsey (collectively, the "individual School Defendants") informed Mr. and Mrs. Fox that, based on section 6355, "C.F. cannot enroll in or attend . . . [s]chool until he gets his vaccinations, and that he cannot get a religious exemption to the vaccination requirement."  (Id., ¶ 27; see id., ¶ 29.)[7]

Meanwhile, C.F.'s brother has been permitted to continue attending school despite his unvaccinated status, as he had an individualized education plan ("IEP") in place on September 1,

---

[6] The Amended Complaint alleges, "in the alternative," that: (1) if the Commissioner's "directive and order . . . did not force [] Loughlin and Munsey to deny . . . a religious exemption for C.F., then they independently decided to deny . . . a religious exemption for C.F"; and (2) if the Commissioner's "directive and order did not force [] Porter to deny . . . a religious exemption and to 'unenroll' C.F. from school, then [] Porter independently decided and made a policy for MSAD 51 that religious exemptions could no longer be granted to the vaccination law and independently decided to 'unenroll' C.F. from school."  Am. Compl., PageID #s 423-24, ¶s 41.6 – 41.7.

[7] Loughlin has since retired, and Munsey is now the Principal of Mabel I. Wilson Elementary School.  See Am. Compl., PageID # 415, ¶s 14-15.

2021, and prior to that date had claimed a religious exemption to vaccination.  (Id., PageID #s 419-20, ¶ 30.)  "C.F. has attention deficit disorder, like his brother, and would qualify for an individualized education plan, if he was allowed to be enrolled in school and was tested."  (Id., PageID # 420, ¶ 31.)  Additionally, Defendants have "not requir[ed] new students to get vaccinated until 90 days after the[y] start attending school" and have "not requir[ed] students with medical conditions" or "teachers, principals, school staff, janitors, visitors (either adults or children), and other non-students to get the vaccinations before coming to school."  (Id., ¶s 31.1 – 33.)

**C.    Procedural Background**

Plaintiffs initiated this action in August 2022, invoking 42 U.S.C. § 1983.  (See Am. Compl., PageID # 413.)  The operative Amended Complaint alleges two counts: a violation of "Plaintiffs' First and Fourteenth Amendment rights" in the form of "freedom of religion/religious discrimination" (Count I); and a violation of "Plaintiffs' Fourteenth Amendment right to Equal Protection" (Count II).  (Id., PageID #s 421, 425.)  Plaintiffs plead these claims against Defendants "individually and in their official capacities."  (Id., PageID # 413.)  As relief for these alleged violations, Plaintiffs request that the Court: find that section 6355 "is unconstitutional on its face, or . . . as applied against [] Plaintiffs"; order Defendants "to allow C.F. to enroll at Mabel I. Wilson Elementary School and . . . enjoin[] [Defendants] from requiring him to get the required vaccinations"; and award damages, attorney's fees, and expert fees to Plaintiffs.  (Id., PageID #s 424, 426-27.)

In January 2023, the Commissioner and the School Defendants filed their respective Motions to Dismiss the Amended Complaint (ECF Nos. 50 & 51).  Shortly thereafter, Plaintiffs filed their Oppositions (ECF Nos. 54 & 55) to the Motions.  In these Oppositions, Plaintiffs clarified that they do not seek: (1) "damages from [the School Defendants] in their official

capacities, and therefore do not object to a dismissal of any such claims" (Pl. Opp. to Sch. Defs. (ECF No. 55), PageID # 701); (2) "injunctive relief from [the School Defendants] in their personal capacities, and therefore do not object to a dismissal of any such claims" (id.); (3) injunctive relief from Loughlin, "since she has retired" (id., PageID # 702 & 702 n.2); (4) damages from the Commissioner in her official capacity (see Pl. Opp. to Comm. (ECF No. 54), PageID #s 678-79); or (5) injunctive relief from the Commissioner in her personal capacity (see id.).

In May, the Court held oral argument on the Motions to Dismiss.  During that hearing, counsel for the Commissioner indicated that she did not anticipate any additional discovery or fact-finding that would be necessary for the Court to resolve the Motions.  (5/8/23 Mot. Hearing Tr. (ECF No. 71), PageID # 777.)  In an effort to streamline the case, the Court asked the parties what their positions were on keeping the Commissioner and Porter as defendants in the case but dismissing the other defendants, provided the parties agreed to a stipulation that any injunctive relief against the Commissioner or Porter "would be sufficient against everybody involved."  (Id., PageID #s 800-02; see id., PageID #s 805-06.)  The Commissioner and School Defendants indicated that they would assent to such a proposal.  (See id., PageID #s 803, 805-06.)  At the request of Plaintiff's counsel, Attorney Whiting, the Court recessed the hearing to allow him to confer with his clients. (See id., PageID # 807.)  Upon reconvening, Attorney Whiting stated: "after discussion with my client we have decided to waive personal liability claims in the case."  (Id.)

With respect to the request for injunctive relief, the Court instructed the parties to confer as to whether they could reach an agreement under which Plaintiffs' official-capacity claims against the Commissioner and Porter would remain, the remaining Defendants would be dismissed, and "adequate relief [would] be provided from the remaining [D]efendants" if Plaintiffs were the prevailing party in this case.  (Id., PageID #s 807-08.)  Two weeks later, Attorney Whiting

filed a letter indicating that his "clients do not want to stipulate to a dismissal of any of their claims" and that, because "Mrs. Fox was not present at the May 8 arguments, and did not agree to a dismissal of the personal liability claims against the individual Defendants, [his] clients are not willing to dismiss those claims either."[8]  (5/22/23 Pl. Letter (ECF No. 74), PageID # 820.)

Then, on May 25th, the First Circuit issued Lowe v. Mills, 68 F.4th 706 (1st Cir. 2023). The same day, Plaintiffs filed a motion requesting that this Court consider Lowe during its review of Defendants' Motions.  (See ECF No. 75, PageID #s 821-22.)  The Court granted the motion and instructed Defendants to file a response "specifically addressing the impact of Plaintiffs' May 22, 2023 letter (ECF No. 74) and [the] First Circuit decision in Lowe . . . on their Motions to Dismiss." (ECF No. 76.)   In their responses, the School Defendants withdrew their "pending Motion to Dismiss (ECF No. 51) as it relates to Plaintiffs' claims for injunctive relief against Superintendent Porter in his official capacity only" (ECF No. 77, PageID # 866), and the Commissioner withdrew "her Fed. R. Civ. P. 12(b)(6) motion to dismiss as to the declarative and injunctive relief sought by Plaintiffs in Count I of their Amended Complaint" (ECF No. 78, PageID # 868).  Addressing Plaintiffs' letter from May 22, the School Defendants reiterated that "dismissal of . . . Principal Munsey and retired Principal Loughlin [] in their official capacities as well as their individual capacities, would not prevent Plaintiffs from obtaining adequate relief, should they prevail on their claims for injunctive relief."  (ECF No. 77, PageID # 867.)  The Commissioner, in turn, indicated that, based on Lowe and Plaintiffs' letter, she "view[ed] the following portions of her Motion to Dismiss as remaining for the Court's decision: (1) official-capacity and personal-capacity damage

---

[8] The Court reads Attorney Whiting's letter as a problematic attempt to walk back from his unequivocal representations to the Court and Defendants at the May 8 hearing that he had conferred with his clients and that they had "decided to waive personal liability claims."  5/8/23 Mot. Hearing Tr., PageID # 807. Nonetheless, in adjudicating Defendants' Motions, the Court has considered the merits of Plaintiffs' personal liability claims.

claims brought against the Commissioner as to Counts I and II of the Amended Complaint; and (2) claims for declarative and injunctive relief against the Commissioner in Count II of the Amended Complaint."  (ECF No. 78, PageID # 868-69.)

## III.  DISCUSSION

The Amended Complaint alleges that "[t]he plain language" of section 6355, as well as Defendants' interpretation and enforcement of the statute, violates the First Amendment's Free Exercise Clause and the Fourteenth Amendment's Equal Protection Clause.  (Am. Compl., PageID # 421, ¶ 35; see id., ¶s 36-38.)  In moving to dismiss the Amended Complaint, Defendants allege, inter alia, that Plaintiffs' free exercise and equal protection claims are subject to dismissal under Rule 12(b)(6) because section 6355 and its enforcement by Defendants pass constitutional muster. They alternatively argue that qualified immunity and/or sovereign immunity applies to certain of Plaintiffs' claims[9]  and that the Amended Complaint fails to state a claim against MSAD 51 for municipal liability.[10]

At the outset, the Court notes that Plaintiffs have waived any damages claims against the Commissioner and individual School Defendants in their official capacities and against MSAD 51. (See Pl. Opp. to Comm., PageID # 679; Pl. Opp. to School Defs., PageID # 701.)  Plaintiffs have also waived any claims against the Commissioner, Munsey, and Porter for injunctive relief in their personal capacities and against Loughlin for injunctive relief in both her personal and official capacities.  (See Pl. Opp. to Comm., PageID # 679; Pl. Opp. to School Defs., PageID #s 701, 702

---

[9] See Commissioner Mot. (ECF No. 50), PageID #s 597-98; School Defs. Mot. (ECF No. 51), PageID #s 622-23.  Sovereign immunity is a relevant defense to Plaintiffs' official-capacity claims, while qualified immunity is a relevant defense to their personal-capacity claims.  M.M.R.-Z. ex rel. Ramirez-Senda v. Puerto Rico, 528 F.3d 9, 13 (1st Cir. 2008) ("[Q]ualified immunity does not apply to official capacity claims, usually aimed at injunctive relief.").

[10] See School Defs. Mot., PageID # 626.

& n.2.)  Accordingly, to the extent Defendants' Motions sought to dismiss any of these waived

claims, the Motions are granted without objection with respect to these claims.

What remains for the Court's consideration is whether Plaintiffs can proceed with: (1) the

request for damages against the individual School Defendants and the Commissioner in their

personal capacities, and against MSAD 51, in Counts I and II; (2) the request for declarative relief

against the School Defendants in Counts I and II and against the Commissioner in Count II in their

official capacities; and (3) the request for injunctive relief against the Commissioner in her official

capacity in Count II and against Munsey in her official capacity and MSAD in Counts I and II.

### A.     Whether Count I of the Amended Complaint States A Plausible Claim for a Violation of the Free Exercise Clause

"The First Amendment's Free Exercise Clause, as incorporated against the states by the

Fourteenth Amendment, protects religious liberty against government interference."  Does 1-6 v.

Mills, 16 F.4th 20, 29 (1st Cir. 2021).  "When a religiously neutral and generally applicable law

incidentally burdens free exercise rights, [courts] will sustain the law against constitutional

challenge if it is rationally related to a legitimate governmental interest."  Id.  "When a law is not

neutral or generally applicable, however," it is subject to strict scrutiny and will pass constitutional

muster only if it "is narrowly tailored to achieve a compelling governmental interest."  Id.  To

determine the neutrality of a law, courts examine factors such as "the historical background of the

decision under challenge, the specific series of events leading to the enactment or official policy

in question, and the legislative or administrative history, including contemporaneous statements

made by members of the decisionmaking body."  Masterpiece Cakeshop, Ltd. v. Colorado Civil

Rights Comm'n, 138 S. Ct. 1719, 1731 (2018) (citation omitted).

A law is not neutral if it "single[s] out religion or religious practices," Does 1-6, 16 F.4th

at 29, and is "not generally applicable if it 'treat[s] any comparable secular activity more favorably

than religious exercise,'" Lowe, 68 F.4th at 714 (citation omitted).   A law lacks general applicability if, for example, "it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" or "it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." Fulton v. City of Philadelphia, Pennsylvania, 141 S. Ct. 1868, 1877 (2021) (cleaned up).  "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." Tandon v. Newsom, 141 S. Ct. 1294, 1296 (2021); see Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020) (per curiam) (describing secular activities treated more favorably than religious worship where either "have contributed to the spread of COVID–19" or "could" have presented similar risks).  This comparability inquiry examines "the risks various activities pose, not the reasons why people gather." Tandon, 141 S. Ct. at 1296.[11]

In this case, Plaintiffs allege that section 6355 and "[t]he manner in which [] Defendants are interpreting and/or enforcing" the statute "violates the First and Fourteenth Amendments to the U.S. Constitution, and violates [] Plaintiffs' First and Fourteenth rights to Free Exercise of Religion."  (Am. Compl., PageID # 421, ¶s 35, 38; see id., ¶s 36-37.)  In Plaintiffs' view, section "6355 and/or the manner in which [] Defendants are enforcing" the statute survives neither strict

---

[11] The Supreme Court has "also carved out an area of 'hybrid situations'" that involve "free exercise claims brought in conjunction with other claims of violations of constitutional protections," such as "the right of parents . . . to direct the education of their children." Parker v. Hurley, 514 F.3d 87, 97 (1st Cir. 2008) (quoting Employment Div., Dept. of Human Res. of Oregon v. Smith, 494 U.S. 872, 881 (1990)).  Only in these hybrid situations has the Supreme Court held that "the First Amendment bar[red] application of a neutral, generally applicable law to religiously motivated action." Smith, 494 U.S. at 881.  However, "[w]hat the Court meant by its discussion of 'hybrid situations' in Smith has led to a great deal of discussion and disagreement." Parker, 514 F.3d at 97.  In this case, the parties did not suggest, let alone discuss, in their briefing whether a "hybrid situation" is at issue here.  At oral argument, the Court asked counsel for the School Defendants whether this was a hybrid case in her view, and she indicated that it was not.  See 5/8/23 Mot. Hearing Tr., PageID #s 810, 812-13.  Because neither Plaintiffs nor Defendants have suggested this is a hybrid case, the Court does not enter "the fray over the meaning and application of Smith's 'hybrid situations' language." Parker, 514 F.3d at 98.

nor rational scrutiny.  (Id., PageID # 422, ¶s 40-41.)  Defendants maintain that section 6355 passes constitutional muster because it is a neutral law of general applicability that is rationally related to a legitimate state interest.  (See Comm. Mot., PageID # 611; School Defs. Mot., PageID #s 629-32.)  Even if section 6355 is subject to strict scrutiny, the Commissioner adds, it "would still withstand [Plaintiffs]' Free Exercise challenge" because Maine's "elimination of nonmedical exemptions is narrowly drawn to achieve the State's interests" in "preventing childhood diseases from taking root in schools [and] in increasing the overall rate of vaccination."  (Comm. Mot., PageID #s 611-12.)

The First Circuit recently addressed whether Maine's refusal to provide religious exemptions to a COVID-19 vaccination mandate for healthcare workers, while continuing to permit certain non-religious exemptions, violated the Free Exercise Clause.  See Lowe, 68 F.4th at 709.  Until 2019, Maine law allowed a religious exemption from healthcare-worker vaccination requirements.  See id. at 710 (citing 22 M.R.S.A. § 802(4-B)(A)-(B) (2019) (amended 2019)).  But in 2019, as was the case here with respect to students, the Maine legislature modified the permitted exemptions.  See id.  In doing so, it repealed the previously afforded religious and philosophical exemptions and "amended the medical exemption to apply where the employee 'provides a written statement from a licensed physician, nurse practitioner or physician assistant that, in the physician's, nurse practitioner's or physician assistant's professional judgment, immunization against one or more diseases may be medically inadvisable.'"  Id.  (citation omitted).  The Lowe plaintiffs, several healthcare workers, alleged that they objected to receiving any of the available COVID-19 vaccines on religious grounds and that each of their requests for a religious exemption and accommodation from their employers were denied.  See id. at 711.  They brought suit against three government officials in their official capacities, alleging "that the [m]andate, by allowing

medical but not religious exemptions, violates the Free Exercise and Equal Protection Clauses of the U.S. Constitution." Id. at 709.[12] The state officials moved to dismiss the complaint on the basis that, inter alia, the complaint failed to state a free exercise claim. Id. at 713. The district court granted their motions and dismissed the complaint. Id. "Applying the Rule 12(b)(6) standard . . ., [the First Circuit] conclude[d] that it is plausible, in the absence of any factual development, that the [m]andate" treats "secular activity more favorably than religious exercise" and is therefore "not generally applicable." Id. at 714 (citation omitted). This determination was "based on the complaint's allegations that the [m]andate allows some number of unvaccinated individuals to continue working in healthcare facilities based on medical exemptions while refusing to allow individuals to continue working while unvaccinated for religious reasons." Id. Because it was therefore "plausible, based on the complaint and without the benefit of factual development, that the [m]andate is subject to strict scrutiny," and because Maine had failed to establish that the mandate met such scrutiny, the First Circuit held that the complaint stated a plausible claim under the Free Exercise Clause. Id. at 717-18. Given the similarity to this case, the Court concludes that Plaintiff's free exercise claim is similarly viable under Lowe.

To evaluate Plaintiffs' free exercise claim, the Court begins by considering the relevant state interest at issue here. While Plaintiffs characterize the asserted government interest as a "moving target," the Commissioner generally cites a state goal of "increasing the overall vaccination rate of schoolchildren, protecting the health of students unable to be vaccinated, and preventing childhood diseases from taking root in schools." (Comm. Mot., PageID #s 609-10; see id., PageID # 608 ("In eliminating nonmedical exemptions to vaccination requirements, the Maine

---

[12] The plaintiffs also alleged a violation of Title VII of the Civil Rights Act of 1964 against their employers, which were various healthcare providers that had denied the plaintiffs' requests for religious exemptions with the justification that religious exemptions were not available under state law. See Lowe, 68 F.4th at 709.

Legislature sought to reverse the trajectory of falling vaccination rates, prevent communicable, preventable diseases from taking root in schools, and protect children and others who are unable to be vaccinated for medical reasons."); id., PageID # 611 (citing interest in "[p]reventing disease from taking root in schools and protecting students unable to be vaccinated for medical reasons").) Plaintiffs instead suggest that "the purpose of the law is to protect school children from getting communicable diseases." (Pl. Opp. to Comm., PageID # 686) (citing 20-A M.R.S.A. § 6352). For the purposes of the below analysis, however, the Court arrives at the same conclusions under either iteration of the state interest.

Based on these proffered interests and the Amended Complaint's factual allegations, the Court finds it plausible that section 6355's non-religious exemptions undermine such "interests in a similar way to a hypothetical religious exemption." Lowe, 68 F.4th at 715; see Church of Lukumi Babalu Aye, Inc. v. City of Hialeah., 508 U.S. 520, 543 (1993) (finding ordinances substantially "underinclusive" for "fail[ing] to prohibit nonreligious conduct that endanger[ed] [the city-defendant's proffered] interests in a similar or greater degree than" the religious activity did). "The availability of a medical exemption, like a religious exemption, could reduce vaccination rates among [students] and increase the risk of disease spread in [schools], compared to a counterfactual in which the [vaccination requirement] contains no exceptions, all [students] must be vaccinated, and neither religious objectors nor the medically ineligible can continue" to enroll in or attend school. Lowe, 68 F.4th at 715. The same principle holds true with respect to the 90-day grace-period provision and the IEP sunset provision. See 20-A M.R.S.A. §§ 6355(1), (4).

There are at least a few aspects of section 6355 that inform this conclusion. As one example: a medical exemption under the current version of section 6355 could potentially last indefinitely, for seemingly no meaningful reason. (See 5/8/23 Mot. Hearing Tr., PageID #s 796-

97.)  To illustrate this point at oral argument, the Court posed to the Commissioner a scenario in which a student is ill with the flu and a health professional certifies that it may be medically inadvisable for the student to be vaccinated at that time.  (See id., PageID # 797.)  In response to the Court's inquiry whether, in such a case, the medical exemption would be "good for 12 years," the Commissioner indicated that it could, as "the State does not interrogate the professional judgment of the medical provider."  (Id., PageID #s 797-98.)  The Court finds it self-evident that such a medical exemption would substantially undermine Maine's proffered interests.  As another example: section 6355 permits an unvaccinated student to attend school with a "written statement" by a physician, nurse practitioner, or physician's assistant that vaccination "may be" medically inadvisable.  This potentially allows a large swath of unvaccinated students to attend school without any meaningful determination that vaccination would actually (let alone, likely) be inadvisable for them.

Section 6355's 90-day "grace period" is an additional example.  The Commissioner conceded that, although a new student would be given 90 days to obtain vaccination before being excluded from school, "a religious family [that] moved into town and . . . need[ed] 90 days to find alternative schooling for [their] child" would not be afforded the same 90-day grace period.  (Id., PageID # 790.)  The Commissioner justified this distinctive treatment on the basis that there is a "greater risk of that [religious] student in the classroom," explaining that, "in order to take advantage of the 90-day grace provision the parent or the student, if they are 18, must sign a statement that they are going to become vaccinated or provide proof of vaccination."  (Id.)  In contrast, the religious parents "are not promising to get their children vaccinated."  (Id.)  The Commissioner, however, conceded that "new students on day one" do not "present any different risk in that classroom" compared to unvaccinated students who claim religious exemptions.  (Id.,

15

PageID # 791.)  Based on these and other aspects of section 6355, the Court concludes that, after drawing all reasonable inferences in Plaintiffs' favor, it is plausible that a version of section 6355 that did not include the current non-religious exemptions "could do an even better job of serving the State's asserted [student] health goals, and that the inclusion of [such non-religious] exemption[s] undermines the State's interests in the same way that a religious exemption would by introducing unvaccinated individuals into" schools.  Lowe, 68 F.4th at 715.

While the Commissioner maintains that "Maine has made no comparative assessment of risk between secular and religious activities" (Comm. Mot., PageID # 609) because "comparability of risk" is not "the appropriate analysis" (5/8/23 Mot. Hearing Tr., PageID # 791), this Court must "assess comparability in the public health context based on 'the risks various activities pose,'" Lowe, 68 F.4th at 715 (citation omitted).  See Tandon, 141 S. Ct. at 1297 ("Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied.")  As in Lowe, the Commissioner's "argument that [Maine] did not independently conduct this type of analysis is, if anything, a reason to be skeptical that dismissal is appropriate absent further factual development."  Id.

However, "it is entirely possible that additional facts might show that the two types of exemption are not comparable."  Id.  "For example (and not by way of limitation), it may be that medical exemptions are likely to be rarer, more time limited, or more geographically diffuse than religious exemptions, such that the two exemptions would not have comparable public health effects."  Id.; see, e.g., We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Dev., 2023 WL 4982325, at *17 (2d Cir. Aug. 4, 2023) (evaluating data regarding prevalence of medical ineligibility and religious objections to vaccination mandate for schools and concluding that

"claims for religious exemptions are far more numerous" than those for medical exemptions). While the Commissioner has provided approximately 150 pages of supporting documentation in connection with her Motion, including excerpts of section 6355's legislative history and statistical data regarding Maine's vaccine rates, neither she nor the School Defendants point to any data in those pages that addresses the comparability of the religious and non-religious exemptions at issue here. (See generally ECF Nos. 49-1 – 49-36, PageID #s 441- 591.) Rather, she notes that: "[i]n 2019, statewide, 6.20%, 4.68%, and 5.13% of kindergarten, seventh, and twelfth grade students, respectively, were claiming exemptions from Maine's mandatory school vaccinations," and, "[b]y 2022, only 1.76%, 1.33%, and 1.24% of students statewide in kindergarten, seventh, and twelfth grade, respectively were claiming the medical exemption or utilizing the IEP sunset provision." (Comm. Opp., PageID #s 595-96.) These calculations fail to address the breakdown of exemptions claimed during those years.[13]  Moreover, the Commissioner neglects to note that in 2019, according to the same data chart that: among seventh-grade students, 0.1% claimed medical exemptions, 0.3% claimed religious exemptions, and 4.3% claimed philosophical exemptions; and, among twelfth-grade students, 0.1% claimed medical exemptions, 0.2% claimed religious exemptions, and 4.9% claimed philosophical exemptions. (See ECF No. 49-32, PageID #s 567, 575.) By 2022: among seventh-grade students, 1.0% claimed medical exemptions, 0.0% claimed

---

[13] As a separate matter, the Court is not convinced that it may properly consider this data at the motion-to-dismiss stage. See Lowe, 68 F.4th at 717. The Commissioner draws the data from 2018-2019 and 2021-2022 "Maine School Age Immunization Assessment Surveys" (ECF Nos. 49-32 & 49-33), which – as she notes – are publicly available on the website of the Maine Center for Disease Control and Prevention as Excel sheets. See Comm. Aff. (ECF No. 49), PageID # 438; Me. Ctr. for Disease Control & Prevention, Immunization Rate Assessment Reports, Maine.gov, https://www.maine.gov/dhhs/mecdc/infectious-disease/immunization/publications/index.shtml (last visited Aug. 16, 2023) (providing links to "School Age Immunization Assessments" for various years). However, "there are limits to [the] license" that a court may consider "matters of public record." Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013). The "Maine School Age Immunization Assessment Survey" Excel sheets the Commissioner cites lack indicia of reliability, "unlike official records, such as birth or death certificates and other similar records of vital statistics." Id. The Commissioner does not propose another basis under which the Court may properly consider this information at this stage.

religious exemptions, and 0.3% claimed philosophical exemptions; and, among twelfth-grade students, 0.9% percent claimed medical exemptions, 0.0% religious exemptions, and 0.3% claimed philosophical exemptions. (See ECF No. 49-33, PageID #s 576, 582.) Suffice to say, based on these numbers, it is plausible that the religious and non-religious exemptions are not comparable.

To be clear, "[t]hat the Legislature repealed a previously authorized religious exemption does not in and of itself transmute the law into a non-neutral law that targets religious beliefs." We The Patriots, 2023 WL 4982325, at *12 (citation omitted). Additionally, it is not lost on this Court that "[o]nly one court -- state or federal, trial or appellate -- has ever found plausible a claim of a constitutional defect in a state's school vaccination mandate on account of the absence or repeal of a religious exemption." Id. at *1; see Bosarge v. Edney, No. 1:22CV233-HSO-BWR, 2023 WL 2998484, at *1 (S.D. Miss. Apr. 18, 2023) (entering preliminary injunction requiring state officials to offer religious exemption from school immunization mandate). Most recently, in We The Patriots, the Second Circuit "decline[d] to disturb this nearly unanimous consensus" and held that Connecticut, which had "for many years exempted religious objectors from its vaccination requirements for students and participants in childcare programs," did not "violate[] the Free Exercise Clause and other federal constitutional and statutory guarantees by repealing that exemption to protect the public health and safety." 2023 WL 4982325, at *1. However, the Connecticut statute reviewed by the Second Circuit is distinguishable from the Maine statutory amendments challenged here.

First, as detailed above, Maine continues to permit multiple non-religious exemptions, including a 90-day grace period for non-religious students, a medical exemption, and the IEP sunset provision, all of which arguably undermine its student health and safety interests while restricting religious exemptions that may pose comparable risks. By contrast, Connecticut's

amended statute permits unvaccinated students to attend school only with a medical exemption, providing "no other possible bases for exemption." We The Patriots, 2023 WL 4982325, at *17.

Second, there is a notable distinction between the medical exemptions provided by Maine and Connecticut.  When Connecticut amended its vaccination requirements in 2021 for students and, in doing so, repealed a previously afford religious exemption, it retained an exemption "for students who present 'a certificate . . . from a physician, physician assistant or advanced practice registered nurse stating that in the opinion of such physician, physician assistant or advanced practice registered nurse such immunization *is medically contraindicated* because of the physical condition of such child.'" Id. at *6 (emphasis added) (citing Conn. Gen. Stat. § 10-204a (2020) and Public Act 21-6 § 1(a)(2)-(5)).  Here, in contrast, Maine's medical exemption allows unvaccinated students to attend school as long as they provide a "written statement" by a physician, nurse practitioner, or physician's assistant that vaccination "*may be*" medically inadvisable for them.  20-A M.R.S.A. § 6355(2) (emphasis added).  As the Second Circuit suggested, Connecticut's "language requires the healthcare provider to reach a determination about medical contradiction that is more certain than what" Maine requires.  We The Patriots, 2023 WL 4982325, at *13 n.19.  Moreover, Connecticut requires "specified documents supporting requests for medical exemptions," id. at *13, whereas Maine requires no supporting documentation or explanation by the medical professional, see § 6355(2).

Third, Connecticut "accommodated religious objectors to an extent [its] legislators believed would not seriously undermine [the vaccination statute]'s goals" by providing, inter alia, a "legacy" provision that allowed "certain children who were already enrolled in school and had previously been granted religious exemptions [to] remain exempt." We The Patriots, 2023 WL 4982325, at *5, 11.  Here, Maine's "legacy" provision is more restrictive and allows previously

19

exempt religious objectors to maintain an exemption only if they were "covered by an individualized education plan on September 1, 2021." § 6355(4).[14]  In light of these differences, the Second Circuit's decision in We the Patriots simply does not dictate the same result here.

Rather, at this juncture, "dismissal would be appropriate only if the materials [the Court] may consider on a motion to dismiss establish that" section 6355 survives strict scrutiny "even when applying the Rule 12(b)(6) plausibility standard."  Lowe, 68 F.4th at 717.  The Court finds it plausible that section 6355 is not narrowly tailored to advance Maine's interests.  For example, as the Commissioner conceded at oral argument, "[t]here is nothing in" section 6355 that requires unvaccinated students who attend school (via a medical exemption or the IEP sunset provision) "to use any sort of protective equipment."  (5/8/23 Mot. Hearing Tr., PageID # 783.)  Thus, it would be "permissible under the State's rules" to "have nonvaccinated IEP students, nonvaccinated 90-day students, [and] nonvaccinated medical-exempt students in [] class without any masks."  (Id.)  Additionally, as the Court noted during another point at oral argument, section 6355 does not require teachers – who share the same classrooms and other school facilities as students – to be vaccinated at all.  (Id., PageID # 788.)

For these reasons, the Court declines to dismiss Plaintiffs' free exercise claim in Count I of the Amended Complaint for failure to state a claim under Rule 12(b)(6).

### B.    Whether Count II of the Amended Complaint States A Plausible Claim for a Violation of the Equal Protection Clause

"The Equal Protection Clause requires states to treat alike all persons similarly situated." Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006); see Mills v. State of Me., 118 F.3d 37, 47 (1st Cir. 1997) ("[E]qual protection of the laws means that no person or class of persons shall be denied

---

[14] At oral argument, the Commissioner conceded that IEP students with a religious exemption do not pose any greater threat than a non-IEP religious exemption student.  See 5/8/23 Mot. Hearing Tr., PageID # 793. Still, while Maine permits the former to attend school, it does not permit the latter.

the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances." (cleaned up)).  "An equal protection claim may challenge legislation or the conduct of individual state actors."  Ashaheed v. Currington, 7 F.4th 1236, 1250 (10th Cir. 2021) (citing J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 130-31 (1994)).

In conducting an equal protection analysis, courts must "determine the appropriate level of scrutiny to be applied to" the plaintiff's claims.  Toledo, 454 F.3d at 33.  "Unless state action burdens a suspect class or impinges upon a fundamental right, [courts] review equal protection claims for a rational relationship between the disparity of treatment and a legitimate government purpose."  Id.  A statute survives strict scrutiny "only if the government can clearly demonstrate a compelling interest incapable of being served by less intrusive means."  Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003).  Under rational basis review, "a challenged statute that does not employ a suspect classification or impinge upon fundamental rights must be upheld if it is rationally related to a legitimate governmental purpose."  Whiting v. Town of Westerly, 942 F.2d 18, 23 (1st Cir. 1991).

Here, Plaintiffs allege that their right to equal protection of the laws has been violated by Defendants' refusal to provide a religious exemption to C.F. while permitting other unvaccinated students to attend school under the 90-day grace period, medical exemption, or IEP sunset provision. (See Am. Compl., PageID #s 425-26, ¶s 43-51; see Pl. Opp. to Comm., PageID # 694 ("Plaintiffs are being denied a religious exemption while numerous other people are being given exemptions in the same school, under the same circumstances, and with the same health risks.").)  In seeking to dismiss this claim, the Commissioner focuses her efforts on the IEP sunset provision, asserting that, "[t]he [State of Maine] Legislature's choice to sunset the IEP provision over time is rationally related to eliminating nonmedical exemptions while also protecting expectation of parents and their

21

children's education." (Comm. Mot., PageID # 615.)  Her position as to why rational basis review applies to Plaintiffs' equal protection claim is that "there are no fundamental rights or suspect classifications at issue in the IEP sunset provision" because "[i]ntellectual disability is not a suspect class, and there is no fundamental right to a public education."  (Id., PageID #s 613-14 & 614 n.21 (citation omitted).)  As Plaintiffs note, however, the IEP sunset provision "is only one of several exemptions and underinclusions to §6355" that Plaintiffs allege renders "Defendants' denial of [] Plaintiff's demand for a religious exemption a violation of their Equal Protection rights."  (Pl. Opp. to Comm., PageID # 695.)  The School Defendants, for their part, contend simply that Plaintiffs' equal protection claim is subject to rational basis review and that, because Plaintiffs' free exercise claim fails under rational basis review, so too does their equal protection claim.  (See Sch. Defs. Mot., PageID # 635; Sch. Defs. Reply (ECF No. 74), PageID # 741.)

Here, Plaintiffs allege that Defendants have violated their right to free exercise of religion, which is a fundamental right.  See Johnson v. Robison, 415 U.S. 361, 375 n.14 (1974) ("Unquestionably, the free exercise of religion is a fundamental constitutional right.").  Accordingly, the Court must apply strict scrutiny.  See Toledo, 454 F.3d at 33; see, e.g., Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., Maryland, 915 F.3d 256, 265 (4th Cir. 2019), as amended (Feb. 25, 2019) ("[W]e apply strict scrutiny under the Equal Protection Clause where . . .  the challenged action interferes with a fundamental right.").  For the reasons delineated above with respect to Plaintiffs' free exercise claim, the Court finds it plausible that section 6355 does not survive strict scrutiny and therefore declines to dismiss the equal protection claim under Rule 12(b)(6).

### C.   Whether the Amended Complaint States A Claim for Municipal Liability Against MSAD 51

The School Defendants maintain that the Amended Complaint fails to a state a claim for municipal liability against MSAD 51, as Plaintiffs' theory of liability is essentially that "MSAD 51

did nothing more than follow the duly-enacted and clearly-stated provisions of Maine law." (School Defs. Mot., PageID # 628; see id., PageID # 626-27.)  The School Defendants add that, "[t]o the extent the Amended Complaint alleges an independent decision in a particular case by one or more of the individual School Defendants – rather than a policy adopted by an individual or entity with final policymaking authority, such as the MSAD 51 School Board – it fails to state a claim for municipal liability."  (Id., PageID # 628) (citing Dirrane v. Brookline Police Dep't, 315 F.3d 65, 71 (1st Cir. 2002) ("[A plaintiff's] claim for damages against [a municipality] . . .  cannot be based on respondeat superior but requires independent liability based on an unconstitutional policy or custom of the municipality itself.").)

Based on the Amended Complaint's allegations, the Court agrees with Defendants that "the basis for the suit against . . . Porter, Loughlin, and Munsey [is that they] followed section 6355 to the very letter of the law, and also acted consistently with the explicit directives of the Commissioner."  (Sch. Defs. Mot., PageID # 625.)[15]  The Amended Complaint alleges that the Commissioner, in enforcing "the official policy of the Maine Department of Education," "informed, directed, and ordered . . . Porter, Loughlin, and Munsey . . . that children can no longer get religious exemptions from the vaccination requirement."  (Id., PageID # 417, ¶s 21 – 21.2.) Porter, Loughlin, and Munsey subsequently "refused to let C.F. attend school for the 2021-2022 school year" because he was unvaccinated and section 6355 no longer permitted religious exemptions to mandatory vaccination.  (Id., PageID # 419, ¶s 25, 27.)  Porter also ultimately

---

[15] Plaintiffs characterize this statement as "untrue," noting that "[s]ection 6355 does not say that school superintendents and principals have to deny requests for religious exemptions which are required by the First and Fourteenth Amendments."  Pl. Opp. to Sch. Defs., PageID # 16.  However, as Plaintiffs concede, "the recent amendment to § 6355 . . . delete[d] the express statutory exemption for philosophical and religious exemptions from the statute."  Id.  Accordingly, it would have been clear to the School Defendants that the amended statute permits only those exemptions delineated therein and therefore a religious exemption, which was no longer included, would not be permitted.

unenrolled C.F. from Mabel I. Wilson Elementary School for these reasons.  (Id., ¶s 26, 27-28.)[1] The Amended Complaint alleges, in the alternative, that if the Commissioner's "directive and order did not force" Porter, Loughlin, or Munsey to deny Plaintiffs a religious exemption (and, in Porter's case, to also "unenroll" C.F. from school), "then they independently decided" to do so. (Id., PageIDs # 423-24, ¶s 41.6 – 41.7.)

"The First Circuit has not decided whether, and in what circumstances, municipal enforcement of state law can be a municipal policy under § 1983."  March v. Frey, 458 F. Supp. 3d 16, 43 n.32 (D. Me. 2020); see Martin v. Gross, 340 F. Supp. 3d 87, 99 (D. Mass. 2018).  In Yeo v. Town of Lexington, however, the concurrence suggested that a municipal policy that is taken in "good faith reliance upon state law . . . cannot give rise to municipal liability under § 1983." 131 F.3d 241, 257 (1st Cir. 1997) (Stahl, J., concurring).  Other circuits are divided on the issue.  The Fourth, Seventh, and Tenth Circuit have suggested that a municipal entity "cannot be liable for merely implementing a policy" created by state law.  Whitesel v. Sengenberger, 222 F.3d 861, 872 (10th Cir. 2000); see Surplus Store & Exch., Inc. v. City of Delphi, 928 F.2d 788, 791 (7th Cir. 1991) ("It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law."); Snyder v. King, 745 F.3d 242, 247 (7th Cir. 2014) (finding no "direct causal link" between a county policy and a deprivation of a federal right where "the only local government 'policy' at issue [was] general compliance with the dictates of state law"); Bockes v. Fields, 999 F.2d 788, 791 (4th Cir. 1993) (finding no municipal liability where county board fired employee "at the prerogative of and within the constraints imposed by the Commonwealth" because "[s]uch bounded, state-conferred discretion is not the 'policymaking authority' for which a county may be held responsible under § 1983").  In the Second Circuit's

view, "a mere municipal directive to enforce all state and municipal laws [does not] constitute[] a city policy to enforce a particular unconstitutional statute." Vives v. City of New York, 524 F.3d 346, 353 (2d Cir. 2008).  Rather, a more nuanced approach is warranted: a municipality cannot be held liable for its decision to enforce a state law that it is required to enforce, but it may be held liable if it "decides to enforce a statute that it is authorized, but not required, to enforce." Vives, 524 F.3d at 353.  Accordingly, the Second Circuit evaluates: (1) whether the municipality had a "meaningful choice as to whether it would enforce" the statute at issue; and (2) if so, whether the municipality "adopted a discrete policy" to enforce the statute "that represented a conscious choice by a municipal policymaker." Id.  The Eleventh Circuit has adopted a similar approach. See, e.g., Cooper v. Dillon, 403 F.3d 1208, 1222-23 (11th Cir. 2005) (finding § 1983 liability where defendant with final policymaking authority made a "deliberate decision" to enforce unconstitutional state statute that the municipality adopted and that authorized, but did not require, defendant's conduct); see also McKusick v. City of Melbourne, Fla., 96 F.3d 478, 484 (11th Cir. 1996) (finding § 1983 liability where decision to enforce injunction in a particular way, despite many alternatives under the injunction's terms, resulted in deprivation of constitutional rights).

If the Court were to assume, without deciding, that the individual School Defendants' actions subjected Plaintiffs to a deprivation of their constitutional rights, Plaintiffs' § 1983 claim against MSAD 51 would fail under any of the foregoing standards.  Under the more flexible Second Circuit standard, for example, it is clear that Porter did not have a "meaningful choice as to whether [he] would enforce" section 6355.  Rather, under state law, he was required as a superintendent to "ensur[e] that the operation of the schools conforms to policies and rules as adopted by the school board *and to state laws* and rules." 20-A M.R.S.A. § 1055 (emphasis added).  Such state laws include, of course, section 6355, which restricts his (and other superintendents') ability to allow

unvaccinated students to enroll in, and attend, school unless under a certain exemption (which does not include religious exemptions).[16] That restriction is mandated and unequivocal under the law, providing no room for any alternative measures. Porter therefore had no meaningful opportunity to afford C.F. a religious exemption under the circumstances. Thus, Plaintiffs' municipal liability claim against MSAD 51, to the extent it relates to Porter's conduct alleged in the Amended Complaint, fails.

With respect to Munsey and Loughlin, Plaintiffs have not alleged in their Amended Complaint (or even their subsequent briefing) that either individual independently developed a "no religious exemptions policy" or was a final policymaker such that their actions could constitute an "official policy" by MSAD 51.[17] Nor have Plaintiffs cited any "state law, including 'valid ordinances and regulations'" that would suggest as much. Walden v. City of Providence, R.I., 596 F.3d 38, 56 (1st Cir. 2010). "Absent this information, the [Amended C]omplaint fails to state more than respondeat superior liability on the part of" MSAD 51, which "is not enough to support a section 1983 action against a municipality." Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013); see Connick v. Thompson, 563 U.S. 51, 60 (2011) (providing that "local governments are responsible only for 'their *own* illegal acts'" and "are not vicariously liable . . . for their employees' actions"); see also Welch v. Ciampa, 542 F.3d 927, 942 (1st Cir. 2008) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." (citation omitted)); Freeman, 714 F.3d at 38 ("A single decision by a municipal

---

[16] Plaintiffs recognize this fact as well. See Pl. Opp. to Sch. Defs., PageID # 701 ("Superintendent Porter has the statutory power and duty to apply and enforce the State's mandatory school vaccination law.").

[17] Indeed, in responding to the School Defendants' argument that the Amended Complaint fails to state a claim for municipal liability against MSAD 51, Plaintiffs address how Porter's conduct is attributable to MSAD 51 but does not address Munsey or Loughlin's conduct at all. See Pl. Opp. to Sch. Defs., PageID # 716.

policymaker constitutes official policy 'only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" (citation omitted)).

In short, Plaintiffs' § 1983 claims against MSAD 51 are subject to dismissal under Rule 12(b)(6).

### D.   Whether the Commissioner and Individual School Defendants Are Entitled to Sovereign Immunity

"The Eleventh Amendment generally bars suits against states and state officials" in their official capacities.  Doe v. Shibinette, 16 F.4th 894, 903 (1st Cir. 2021).  This proscription is subject to an exception that "allows federal courts to grant prospective injunctive [or declaratory] relief [against state officials] to prevent a continuing violation of federal law."  Id. (cleaned up); see Poirier v. Massachusetts Dep't of Correction, 558 F.3d 92, 97 n.6 (1st Cir. 2009) ("A plaintiff may seek prospective injunctive relief against a state official, but may not obtain such relief against a state or its agency because of the sovereign immunity bar of the Eleventh Amendment.").  In determining whether such an exception applies to a particular suit, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002) (citation omitted).

Here, Plaintiffs bring official-capacity claims against Defendants only for injunctive relief.[18]  The Court therefore proceeds to consider whether the Amended Complaint alleges an ongoing violation of federal law and readily concludes that it does.  (See, e.g., Am. Compl., PageID # 421, ¶ 35 ("Title 20-A M.R.S. § 6355 violates the First and Fourteenth Amendments to the U.S. Constitution, and violates the Plaintiffs' First and Fourteenth rights to Free Exercise of Religion.");

---

[18] Any official-capacity damages claims would be subject to dismissal under Rule 12(b)(1). See Doe, 16 F.4th at 903.

id., ¶ 38 ("The manner in which [] Defendants are interpreting and/or enforcing Title 20-A M.R.S. § 6355's vaccination requirement against C.F. constitutes religious discrimination and violates the Plaintiffs' First and Fourteenth Amendment rights to Free Exercise of Religion.").)   The Court also finds that the relief sought is properly characterized as prospective.  (See id., PageID #s 424, 426 (requesting that "Defendants be ordered to allow C.F. to enroll at Mabel I. Wilson Elementary School and that they be enjoined from requiring him to get the required vaccinations"); id. (requesting "that the Court find that Title 20-A M.R.S. § 6355 is unconstitutional on its face, or is unconstitutional as applied against [] Plaintiffs").)   The exception to Eleventh Amendment immunity therefore permits Plaintiffs' suit, to the extent it seeks injunctive and declaratory relief, to proceed against the Commissioner, Porter, and Munsey in their official capacities.[19]   See Verizon Maryland, 535 U.S. at 645-46, 648; see also Dirrane, 315 F.3d at 71 ("[I]n the sovereign immunity context, the Supreme Court has repeatedly said that an official who acts unconstitutionally can be enjoined even though the state is immune from damages.").

### E.    Whether Defendants are Entitled to Qualified Immunity

"When government officials are sued in their individual capacities for money damages, the doctrine of qualified immunity shields them from pecuniary liability unless their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"   Lawless v. Town of Freetown, 63 F.4th 61, 67 (1st Cir. 2023) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).   A court may begin its assessment of a qualified immunity bid by: (1) "determining whether the conduct in question violated a federal statutory or constitutional right"; or (2) "determining whether the unlawfulness of the conduct was clearly established at the time."   Id.   The latter inquiry considers "(1) the relative clarity of the governing

---

[19] The Court notes that Defendants have not presented any arguments to the contrary.

law to a reasonable official on the date of the alleged wrong and (2) whether the specific characteristics of the situation confronted by the official would have made it clear to a reasonable official how the governing law applied in the given situation." Id. (citing Punsky v. City of Portland, 54 F.4th 62, 66 (1st Cir. 2022)). "Together, these aspects of the inquiry must persuade [the court] that available precedent placed the legal question beyond debate such that any reasonable official would have appreciated the illegality of the conduct in question." Id.; see City & Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600, 611 (2015).

"The test to determine whether a right is clearly established asks whether the precedent is clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply and whether the rule's contours were so well defined that it is clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted." Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020) (cleaned up); see Mullenix v. Luna, 577 U.S. 7, 11 (2015) ("A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" (citation omitted)). "A rule is clearly established either when it is dictated by controlling authority or a robust consensus of cases of persuasive authority." Irish, 979 F.3d at 76 (cleaned up). "A 'robust consensus' does not require the express agreement of every circuit. Rather, sister circuit law is sufficient to clearly establish a proposition of law when it would provide notice to every reasonable offic[ial] that his conduct was unlawful." Id. Additionally, "cases involving materially similar facts are not necessary to a finding that the law was clearly established." Id.; see Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

At the same time, however, the Supreme Court has emphasized that "'clearly established law' should not be defined 'at a high level of generality.'" White v. Pauly, 580 U.S. 73, 79 (2017). It "must be 'particularized' to the facts of the case" because, "[o]therwise, 'plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" Id. (citation and internal brackets omitted).[20] As such, "'general statements of the law are not inherently incapable of giving fair and clear warning' to offic[ials]." Id.; see id. at 80 (explaining that lower court's recognition that the case before it "'present[ed] a unique set of facts and circumstances' . . . alone should have been an important indication . . . that [the officer]'s conduct did not violate a 'clearly established' right"). The burden to identify controlling authority or a consensus of persuasive authority is a "heavy burden" that falls on the plaintiff. See Est. of Rahim by Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022).

Because the qualified immunity doctrine provides "immunity from suit rather than a mere defense to liability, [] it is effectively lost if a case is erroneously permitted to go to trial." Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021) (internal quotations and citations omitted). Accordingly, to protect officials from unnecessary litigation burdens, the Supreme Court and First Circuit have often emphasized the importance of addressing issues of qualified immunity "at the earliest possible stage in litigation." Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (citation omitted); see, e.g., Est. of Rahim, 51 F.4th at 411 (concluding it was error for district court to find "that consideration of the 'clearly established' prong of the qualified immunity defense was premature before discovery"). Thus, although additional factual development may

---

[20] "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft, 563 U.S. at 742.

be beneficial to this Court's analysis, the Court addresses Defendants' qualified immunity claims at this stage.

As detailed above, the Free Exercise Clause and the Equal Protection Clause provide the legal backdrop for this Court's evaluation of Defendants' claims for qualified immunity.  Because "the latter aspect of the qualified immunity analysis . . .  affords the most direct route to consideration of the clarity of the governing law," this Court will begin by determining whether the alleged unlawfulness of Defendants' conduct was clearly established at the time alleged in the Amended Complaint.  Lawless, 63 F.4th at 67; see Penate v. Hanchett, 944 F.3d 358, 366 (1st Cir. 2019) ("Courts need not engage in the first inquiry and may choose, in their discretion, to go directly to the second.").  Here, the Amended Complaint alleges that "[t]he legal principle that governments and government employees cannot discriminate against citizens with religious objections by interpreting and enforcing a law against them when the law has exclusions for other groups and is substantially underinclusive . . . was firmly established prior to 2022." (Am. Compl., PageID # 422, ¶ 41.1.)  In their Oppositions, Plaintiffs phrase this argument slightly differently: "the principle that it is unconstitutional to apply a law in a way that denies religious exemptions while granting other exemptions to people similarly situated has been clearly established since 1990"; and "it has been universally recognized since the U.S. Constitution was adopted, in 1788, that a state law cannot negate a person's federal constitutional rights." (Pl. Opp. to Comm., PageID # 696; Pl. Opp. to School Defs., PageID #s 713-14.)  Accordingly, Plaintiffs maintain that "Defendants must have known - or clearly should have known - that the removal of the religious exemption from Title 20-A M.R.S. §6355 could not take away peoples' constitutional rights to religious exemptions under the Free Exercise Clause when it is so underinclusive and so riddled

31

with other exemptions." (Pls. Opp. to School Defs., PageID # 714 (emphasis omitted); see Am. Compl., PageID #s 422-23, ¶s 41.1 – 41.3.)

However, Plaintiffs have failed to present a "controlling authority or a robust consensus of cases of persuasive authority" that supports their position regarding the state of the law at the time of Defendants' conduct. See Irish, 979 F.3d at 76 (citation and internal quotation marks omitted). Although "[t]he vast majority of States offer religious exemptions from vaccination requirements" for students, the Court reiterates that "[o]nly one court -- state or federal, trial or appellate -- has ever found plausible a claim of a constitutional defect in a state's school vaccination mandate on account of the absence or repeal of a religious exemption." We The Patriots, 2023 WL 4982325, at *1; see Bosarge, 2023 WL 2998484, at *1 (entering preliminary injunction requiring state officials to offer religious exemption from school immunization mandate).[21] As the School Defendants highlight, mandatory immunization laws for students have been frequently "upheld as constitutional, even absent religious exemptions." (School Defs. Reply, PageID # 734); see, e.g., Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944) (explaining that a parent "cannot claim freedom from compulsory vaccination for [his] child more than for himself on religious grounds," as "[t]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death"); Workman v. Mingo Cnty. Bd. of Educ., 419 F. App'x 348, 353-54 (4th Cir. 2011) ("[W]e conclude that the West Virginia statute requiring vaccinations as a condition of admission to school does not unconstitutionally infringe [an individual]'s right to free exercise. This conclusion is buttressed by the opinions of numerous federal and state courts that have reached similar conclusions in comparable cases."); Phillips v. City of New York, 775 F.3d 538, 543 (2d Cir. 2015) (noting that, although New York law

---

[21] Notably, Bosarge was issued *after* Defendants made the decision to deny Plaintiffs a religious exemption and unenroll C.F.

permitted a religious exemption to mandatory vaccination of students, "New York could constitutionally require that all children be vaccinated in order to attend public school"); Whitlow v. Cal. Dep't of Educ., 203 F. Supp. 3d 1079, 1085-87 (S.D. Cal. 2016) (rejecting plaintiffs' argument that California law violated "their right to free exercise by (1) failing to provide a religious exemption to the vaccine mandate, (2) forcing parents to choose between the dictates of their faith and their children's education, and (3) offering secular exemptions (medical, home schooling and IEP) while refusing to provide a religious exemption").  The law was therefore not "clear enough that every reasonable official would interpret it to establish the particular rule" Plaintiffs assert and that such rule was not "so well defined that" it would have been clear to reasonable officials that their conduct "was unlawful in the situation [they] confronted."  Irish, 979 F.3d at 76 (citation omitted); see, e.g., Cooper, 403 F.3d at 1220 (finding qualified immunity for police chief whose enforcement of unconstitutional state statute deprived the plaintiff of his constitutional rights, because the statute "had not been declared unconstitutional" at the time "and therefore it could not have been apparent to [the police chief] that he was violating [the plaintiff]'s constitutional rights").[22]

In sum, the Court finds that it was not clearly established during the period alleged in the Amended Complaint that failing to permit a religious exemption to mandatory school vaccination (while providing others certain non-religious exemptions) violates religious objectors' constitutional rights.  Thus, even if the Court were to assume – without deciding – that section

---

[22] According to Plaintiffs, it is "irrelevant" that "the principle that it is unconstitutional to apply a law in a way that denies religious exemptions while granting other exemptions to people similarly situated" has "not yet been applied in a school vaccination case."  Pl. Opp. to School Defs., PageID #s 713-14.  However, the relevant inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Mullenix, 577 U.S. at 12 (citation omitted).  In the context of mandatory vaccinations (for schoolchildren or otherwise), it was not clearly established at the times alleged in the Amended Complaint that it would be unconstitutional to permit the non-religious exemptions at issue while denying religious exemptions.

6355 is unconstitutional, it would be "unfair to subject" the Commissioner and the individual School Defendants "to money damages for picking the losing side of the controversy" by complying with section 6355. Wilson v. Layne, 526 U.S. 603, 618 (1999). For these reasons, they are entitled to qualified immunity. See Mullenix, 577 U.S. at 12 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." (citation omitted)). The Court therefore dismisses Plaintiffs' claims for damages against the Commissioner and the individual School Defendants in their individual capacities.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motions (ECF Nos. 50 & 51). The Court hereby dismisses all claims against MSAD 51 and Loughlin in their entirety. To the extent the Amended Complaint seeks money damages against Commissioner Makin, Porter, and Munsey, this claim for relief is also dismissed. Accordingly, this case shall proceed against the Commissioner, Porter, and Munsey for injunctive and declaratory relief in their official capacities as to both Counts I and II.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 16th day of August, 2023.